IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | NO. 98-CR-30022-WDS |
| GUY J. WESTMORELAND, | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**STIEHL, District Judge:**

Before the Court are defendant's pro se motion for New Trial (Doc. 890) a Supplement to that motion (Doc. 904) and two Motions to Appoint Counsel (Docs. 899 and 925), as well as other related motions. The government has filed a response to the motion for new trial, and the supplement (Doc. 918) and the defendant has filed a reply (Doc. 923).

The defendant was indicted on a Fourth Superseding Indictment and charged with Conspiracy to distribute and possess with intent to distribute controlled substances (Count 1); using and carrying a firearm during and in relation to a drug trafficking crime (Count 2); causing the interstate travel of Debra Abeln, with the intent to murder Debra Abeln (Count 3); conspiracy to cause the interstate travel of Debra Abeln with the intent to murder Debra Abeln (Count4); the murder of Debra Abeln with the intent to prevent her communication to law enforcement regarding a drug trafficking conspiracy(Count 5); and using and carrying a firearm during and in relation to a crime of violence (*See Fourth Superseding Indictment,* Doc. 648)

The Court bifurcated the trial and held the trial related to the drug charge in August of 1998. (Westmoreland I trial), and the murder-related charges in 2001. The drug conviction was

appealed and affirmed, *United States v. Westmoreland*, 240 F.3d 618, 637 (7th Cir. 2001) (*Westmoreland I*). The murder related charges were appealed and affirmed in *United States v. Westmoreland*, 312 F.3d 302 (7th Cir. 2002) (*Westmoreland II*).

This motion for new trial relates to the trial on the murder-related charges. The defendant asserts that he is entitled to a new trial on the grounds that he has "newly discovered evidence" that the affair between the investigating case agent, Marty Milkovich, and the defendant's wife, Bronnie Westmoreland [1](which was revealed before the trial) was of such a nature that it warranted a new trial, and a hearing on this matter. He also raises claims that Milkovich recanted his testimony from the first trial (he did not testify at the second trial) concerning Westmoreland's post-arrest statement; and his third claim is that Special Agent Kevin Martens testified falsely during Milkovich's disciplinary hearing.

**I.     BACKGROUND**

The defendant and his co-defendants conspired to murder Debra Abeln, in part to protect a drug trafficking scheme (although it was later learned that she was not a threat to that scheme, she was just a marital encumbrance to her husband, Westmoreland's co-conspirator, Richard Abeln). The scheme was carried out among Westmoreland, the victim's husband, Richard Abeln, and DeAndre Lewis, who was the person hired to commit the murder. The evidence at trial revealed that, at Richard Abeln's request, Lewis, who had worked for Westmoreland, was hired by Westmoreland to kill Debra Abeln at CRT Aviation, in Sauget, Illinois. Richard Abeln and Westmoreland conspired to have the victim brought to the Airport by her husband (in the company of their 12 year old son) where she was shot by Lewis while still in her car.

---

[1] Bronnie Westmoreland was, at the time of the affair, cooperating in the government's investigation of the defendant's role in the death of Debra Abeln.

Westmoreland and Richard Abeln had been friends and business associates in the early 1990s. In late 1996 or early 1997 they began purchasing and distributing cocaine. During the period between the start of their drug conspiracy and the death of Debra Abeln, they acquired some seven kilograms of cocaine and approximately two hundred pounds of marijuana. Richard Abeln had decided that he no longer wanted to be married to Debra Abeln, and complained to Westmoreland that Debra Abeln had learned of their drug activities and had threatened to turn them in to authorities. Westmoreland then made arrangements to take care of Abeln's "problem." They agreed to have Debra Abeln murdered at CRT Aviation in Illinois, and Westmoreland made arrangements with Lewis to commit the murder. Lewis testified that after a failed first attempt, Richard Abeln brought Debra Abeln to CRT Aviation a second time and she was murdered. Westmoreland was on a family cruise during the time of the murder. [2]

As part of the evidence at trial in Westmoreland II, the defendant's wife, Bronnie Westmoreland, testified as to the destruction of evidence (directed by Westmoreland after his arrest) including the destruction of a vehicle involved in the murder. As the government details, the affair between the defendant's wife and Milkovich, was discovered before the second trial, and was disclosed to the defense. The affair was a "significant issue in the case," and was the reason why the government chose not to seek the death penalty against the defendant and his co-conspirator Deandre Lewis (See, Doc. 577). The defendant asserts that the affair actually started earlier than the government has stated, and, therefore, supports his claim to entitlement to a new trial.

---

[2]The Seventh Circuit's decisions on appeal provide a review of the charges against the defendant, and the evidence adduced at trial, so the Court need not repeat those as part of this review. *See, Westmoreland II*, 312 F.3d at 305-06; *Westmoreland I* .

The record reveals that prior to trial, the government revealed, both to the Court and to defense counsel, information it had concerning the affair. In fact, the government provided exhaustively detailed records and investigative files concerning this relationship. The defendant has asserted that the affair actually started as early as March of 1998. There is nothing in those materials which would support any finding other than that the affair began in and around November of 1999.

Before trial the Court ruled, as part of its ruling on the government's motion in limine (Doc. 758), that the defendant could not call Milkovich (whom the government did not call) as a witness in his case solely to impeach him concerning their affair. The Court noted that the affair began more than year after the defendant's conviction on the drug conspiracy charges. *Id.* at 3. With respect to Bronnie, the Court held that the defendant could explore the nature of their affair as a means of impeaching her testimony. The Court noted in that Order, "Defendant's ex parte submission in support of his contention that the affair began earlier is not highly persuasive. It only hints at an earlier meeting between the two, but does not clearly, or even likely, establish any sexual relationship existed." *Id.* at n.3. The Court further directed that before such evidence would be a grounds for impeachment inquiry that the defendant would have to "satisfy the requirements of Fed. R. Evid. 613(b)." *Id.*

The Court is well satisfied that the record which was before it before trial on the murder-related charges, and the record before it now, support a finding that the affair did not start before November of 1999. Nonetheless, the Court will review each of defendant's allegations individually, in an effort to determine whether the defendant is entitled to a hearing on the motion for new trial, and, therefore to the appointment of counsel, or if the motion can be

resolved on the pleadings.[3]

## II. MOTION FOR NEW TRIAL

The defendant first asserts that he is entitled to a new trial because his information indicates that the affair between Bronnie and Milkovich began earlier than November of 1999, as was asserted at trial. The defendant asserts that it had started as early as March of 1998, and would have impacted the entire investigation of the case. The defendant claims that the Court's finding that the affair began in November of 1999 was prejudicial, because by November of 1999, the bulk of the murder investigation had concluded. The defense, during the murder trial, was allowed to cross-examine the witness Bronnie Westmoreland, about the affair, when it began, and how it was carried out. (Transcript of Trial, vol. IX, p. 12 and following).

The defendant's second assertion is that after the trial in Westmoreland I, Milkovich changed his testimony regarding the defendant's post-arrest statement. Milkovich had testified that Westmoreland admitted being involved in drug trafficking with his co-defendant, Richard Abeln, but denied that he was involved in the murder-for-hire scheme. Westmoreland's statement was made to both Milkovich and to Master-Sergeant Calvin Dye. He has provided the affidavits of persons other than Milkovich as to that recantation, but does not address the fact that it was Dye who testified as to his post-arrest statement at the second trial on the murder-related charges. Therefore, the "recanted" testimony of Milkovich does not change the fact that the jury in Westmoreland II heard only Dye's testimony as to the confession, and any recantated testimony from the first trial could not have influenced the verdict in the murder trial.

---

[3]The Court acknowledges the extreme age of these pending motions. The Court, has, therefore, undertaken a careful review, to determine if further briefing is warranted in this matter. After careful review, the Court has concluded that neither further briefing, nor an evidentiary hearing on the matters raised by the defendant are warranted, as set forth more fully above.

Finally, he asserts that Special Agent Kevin Martens lied during the disciplinary hearing for Malkovich concerning a visit to property that the Westmoreland family owned in Bland, Missouri, in 1999. The defendant asserts that this visit occurred in 1998, not 1999.

### A        Standard of Review of Motion for New Trial

Rule 33 of the Federal Rules of Evidence provides that a motion for new trial may be granted based on "newly discovered" evidence if required in "the interests of justice." To receive a new trial based on such a claim, "the defendant must demonstrate that the evidence (1) came to [his] knowledge only after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial." (Insert citation) . As the Seventh Circuit set forth in *United States v. Erivn,* 540 U.S. 623, 631 (7th Cir. 2008), "To obtain a new trial based on newly discovered evidence, a defendant must show, among other things, that the evidence in question 'is material and not merely impeaching or cumulative,' and that it 'probably would lead to an acquittal in the event of a new trial.' *United States v. Hodges,* 315 F.3d 794, 801 (7th Cir.2003)."

With respect to "recanted testimony" the Court must determine whether it is reasonably well satisfied that the testimony in question was false; that the jury might have reached a different conclusion if the false testimony had not been admitted or if it had known that the testimony was false; and that the defendant was taken by surprise by the false testimony and was "unable to meet it or did not know its falsity until after the trial." *United States v. Taylor*, 600 F.3d 863, 870 (7th Cir. 2010).

Ordinarily, "newly discovered impeachment evidence will not warrant a new trial" under

*Brady v. Maryland*, 373 U.S. 83 (1963). Further, evidence is only "material" if there is a "reasonable probability" *Strickler v. Greene*, 527 U.S. 263, 280 (1999) that if the evidence had been disclosed, "the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006). "Of course, this means that only admissible evidence can be material, for only admissible evidence could possibly lead to a different verdict." *United States v. Salem*, 578 F.3d 682, 686 (7th Cir. 2009)(*citing United States v. Silva,* 71 F.3d 667, 670 (7th Cir.1995)).

### 1.    Newly Discovered Evidence Concerning the Affair

The critical part of the defendant's motion and supplement to the motion addresses the affair between Bronnie and Milkovich. The defendant asserts that the affair started much before the time asserted by the government, which is critical to his motion because by November of 1999, the murder investigation had been mostly completed, and the evidence of the affair was relevant as a method of impeaching both Bronnie and Milkovich. If the affair began earlier than 1998, then the impeachment may have been relevant to the investigation itself, and potentially that there was a viable challenge to the evidence itself.

In support of his motion, the defendant has filed a series of affidavits that support his claim that the affair actually began earlier than November of 1999. In particular, the affidavit of of Tina Kuehl, the defendant's sister, provides that in March of 1998 she saw a man leave Bronnie's residence, tucking his shirt into his pants, and that as a result she believed they were having an affair. She determined at the trial, in August of 1998 (*Westmoreland I*) that same man was Milkovich. The defendant does not provide how and, most importantly, *when* he learned of the revelation which his sister made. This is fatal to a claim of "newly discovered" evidence

which was only learned *after* trial, given that this concern was raised well before the murder-related trial in 2001. As the Court noted above, the defendant had tried to establish before trial that there had been an earlier start date to the affair, which was the subject of the Court's Order at on the Motion in Limine. Critically, the defendant asserts that the Kuehl affidavit is the same affidavit which the Court rejected in the 1998 drug trial, *Westmoreland I*.

As the Court ruled in the murder trial, the defendant's evidence did not support an assertion of an earlier start date to the affair. The quality of that evidence has not improved with this motion, because it the same claim, and the same basic evidence. Not only is this not, in any manner, "newly discovered," given the relationship of the defendant to his sister, and the evidence that she assisted Bronnie in the destruction of evidence and obstruction of justice after the murder of Debra Abeln, (Vol VII, pp. 135-40; Vol. X 34-35), the Court cannot find that this evidence would rise to the level of material evidence which would likely lead to acquittal in the event of a re-trial.

The Court **FINDS** that the affidavits provided by the defendant, i.e. those of Amy Wade and Greg Schmidt, are not of such a nature to support his assertions for a new trial, or even for a hearing on that motion. They are without any foundation as to how the affiants may have been able to identify the individual allegedly involved with Bronnie as Milkovich, and that omission is fatal to their admissibility, and therefore, to their materiality. The defendant asserts that these additional affidavits corroborate the earlier evidence of his sister's observations. That assertion only further undermines his claim that the evidence of an earlier beginning to the affair could qualify as "newly discovered" evidence. The key to his claim of "newly discovered" evidence must be that the evidence was not, and could not have been, known, at the time of the trial. No

8

matter how presented, the defendant's claims are all that this information was known, and in fact, was raised at trial.

Finally, the defendant asserts that the government suborned perjury because, he asserts, one of the attorneys for the government, Ms. Morrissey, was involved in efforts by Bronnie to obtain an abortion, and that Morrissey did so to help cover up the earlier start date for the affair. The defendant cites a portion of the transcript as follows:

> Q. (By Attorney Rosenblum) Can you even count how many
> discussions you had with
> Morrissey?
> A. Not exactly.
> Q. Too many to count?
> A. I don't know. I can count that high, but . . .
> Q. But it would be a high number, right?
> A. I guess, yeah.
> Q. Would you say that you developed a friendship with her?
> A. No.
> Q. Would you say that she became a confidant of yours?
> A. No.
> Q. Were there times that you discussed with her deeply personal
> things?
> A. Not outside the case.
> Q. Not outside the case?
> A. Huh-uh.
> MR. ROSENBLUM: Could we approach the bench, Your Honor?
> (Whereupon the following proceedings were held at sidebar, out of
> the hearing of the jury:)
> MR. ROSENBLUM: This is leading to this series of other questions.
> Ive asked this witness if they've discussed personal things. I wasn*t
> going to get into the abortion. No discussions about deeply personal
> things outside the case. It would be my contention that her
> discussion about abortions --
> MS. MORRISSEY: Judge, I*d ask him to lower his voice, first of
> all, please.
> THE COURT : Try to do that.
> MR. ROSENBLUM: My discussion --- her discussions with Ms.
> Morrissey about the fact she
> was having an abortion or had an abortion, I think, is now related to
> the case. I think it goes to show the nature and extent of her

>  relationship with the prosecuting attorney, which goes to bias.
>   MS. MORRISSEY: Judge, I disagree. The whole issue came up
>  because the defendant's sister
>  was calling members of her husband*s family and trying to elicit
>  them as witnesses on that subject. And that is what was reported to
>  me. It was during the course of the case, it was, she believed, was
>  worried about it coming into this as well.
>  THE COURT: They are matters outside the case.
>  MR. ROSENBLUM: Okay.
>  (Whereupon the proceedings at sidebar were concluded. The
>  following proceedings were held
>  in open Court:)
>  Q. (by Mr. Rosenblum) You refer to Ms. Morrissey and Mr. Leggans
>  as Kit and Tom, do
>  you not?
>  A. At times.

TT, Vol. IX pp. 16-17.

It is well settled that the use of suborned perjury may be grounds for a new trial, but such a claim is "a serious accusation." *United States v. Mahalick*, 498 F.3d 475, 480 (7th Cir. 2008). Further "it takes more than . . . witnesses' differing recollections to sustain a perjury charge." *Id.* The defendant's citation to this section of the transcript does not support his claim that there was any effort by the government to either aide in the acquiring of an abortion, nor to in any manner suborn perjury. Although such claims are easy to make, due to their serious nature, there must be more than mere conjecture to rise to the level of such a showing.

The Court finds baseless the defendant's assertion that the transcript in any manner provides that Ms. Morrissey suborned perjury in this case, *see*, *Mahalick*, *Id.*

### 2.      Alleged Recanted Confession of Milkovich

The defendant asserts that Milkovich recanted his confession concerning the drug connection between the defendant and Abeln. The Court notes that Milkovich was not the only person who testified during *Westmoreland I* with respect to the drug activities of the Abeln

10

conspiracy.  As the defendant noted in his motion, Special Agent Calvin Dye also testified at the trial that the defendant stated, at the time of his arrest, that he knew nothing about the murder, but *was* involved in the drugs with Abeln.  (Tr. X, p. 105 ff.).

Recanted testimony is suspect, in and of itself.  When considering the impact of recanted testimony, especially when it concerns allegedly false trial testimony, the Court must consider: "whether: (1) [it is] reasonably well satisfied that the testimony given by [the witness] at trial was false; (2) the jury might have reached a different conclusion absent the false testimony or if it had known that [the] testimony was false; and (3) the defendant was taken by surprise when the false testimony was given, and was unable to meet it or did not know its falsity until after the trial."  *United States v. Taylor*, 600 F.3d 863, 870 (7th Cir. 2010).

In this case, the "new evidence" of the defendant's post- arrest statement is that Milkovich changed his testimony.  However, Mikovich did not testify at the murder portion of the trial.  Therefore, the recanted testimony simply *could not* have impacted the jury's decision because he did not testify.  Moreover, as stated above, Calvin Dye did testify as to Westmoreland's post arrest statement, and he has not recanted his trial testimony.

The defendant, with circuitous reasoning,  attempts to bring Milkovich into the murder trial, asserting that because Westmoreland's  confession led to recovery of cocaine bags, which then implicated his wife, Bronnie, who *was* a key witness at the murder trial (and, who had been in the affair with Milkovich), that Milkovich's recantation was critical to the murder trial.  The defendant asserts that therefore, Milkovich's prior testimony in the drug case infected the murder trial, and warrants a new trial, or at least an evidentiary hearing on the matter.  Although Milkovich was central to the investigation the defendant had the opportunity to thoroughly cross

11

examine him at the first trial. Although Milkovich's testimony was critical to the *drug* portion of the defendant's trials, the fact that Milkovich did not testify at the murder trial makes his recantation of little impact in the motion for new trial on the murder charges.

The Court, therefore, **FINDS** that the defendant has not raised sufficient grounds for granting a new trial, or for a hearing, based on Milkovich's recanted testimony and the motion on this ground is **DENIED**

### 3. Newly Discovered Evidence re Trip to the Westmoreland Farm

The defendant also asserts that the government's agent, Kevin Martens, IRS, visit to the Westmoreland farm could not have occurred when Martens believed it did. But, as the government notes, Martens did not testify as to the visit to the farm, therefore, it was irrelevant to the murder trial.

The defendant's focus is on a portion of Martens' testimony at Milkovich's administrative hearing (concerning the improper affair with Bronnie) that he had counseled Milkovich at one time about not being alone with Bronnie once she was a cooperating witness. Martens testified at the administrative hearing that he would have had the conversation with Milkovich when they were looking for a pickup which was thought to have been involved in the murder.[4] The defendant claims that this trip to the farm had to happen in 1998 because Bronnie told the agents, after she began cooperating in 1999, that the pickup had been crushed, therefore, there was no reason for them to go to the farm to look for the pickup. The defendant asserts that Martens stated that "the only reason we knew about the pickup truck came from Bronnie." It is not, however, either inconceivable that the agents would, despite being told that a vehicle had

---

[4] The evidence was that DeAndre Lewis drove the pickup to the murder and then the defendant took the pickup from him.

12

been "crushed" check out the defendant's farm, and, as Martens stated at the Administrative hearing, some junkyards.[5] The Court **FINDS** that the testimony of Agent Martens at the Administrative hearing does not amount to newly discovered evidence that confirms that the affair took place any earlier than 1999.

## CONCLUSION

The Court has reviewed all of the assertions of the defendant, but **FINDS** that they do not amount to "newly discovered" evidence which would be the basis for a new trial in this matter. The Court notes that a hearing in this matter is not warranted, despite the passage of time since the original motion was filed, because the defendant's "evidence" is simply not newly discovered.

Therefore, the Court **DENIES** on all grounds raised, the defendant's pro se motion for new trial (Doc. 890) and to proceed summarily to ruling and for sanctions (Doc. 917). The Defendant's Motions to Appoint Counsel (Doc. 899 & 925) are **DENIED.**

All other pending motions (Docs. 915 and 931) are **DENIED** as moot.

**DATED: 13 December, 2010**

                                                      **/s/ WILLIAM D. STIEHL**
                                                         **DISTRICT JUDGE**

---

[5]The defendant relies, heavily, on the affidavit of his farm overseer, Thomas J. Lahmeyer, who states that in the Spring of 1998 two agents came to the farm in Bland, Missouri, asking to look over the property. He describes the individuals as two men, in plain clothes, both approximately 5'11" to 6' with medium build (180-190) and light brown hair. The Court has had Agent Martens testify for approximately 20 years. He is not of medium build, and has not, for that period of time, been of that build. Nor has he had brown hair during that period of time. The affidavit is, therefore, not persuasive that agents Milkovich and Martens were the two individuals at the farm in 1998.